**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Baltimore Division)**

| | | |
|---|---|---|
| *In re:* | * | |
| **ANDREW B. HUDYMA,** | * | **Case No. 20-20661 NVA** |
| **Debtor.** | * | **(Chapter 11)** |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*


**AMENDED DISCLOSURE STATEMENT**
**IN SUPPORT OF THE PLAN OF REORGANIZATION**
**PROPOSED BY THE DEBTOR**


**Robert B. Scarlett, Esquire**
**SCARLETT & CROLL, P.A.**
**201 N. Charles Street**
**Baltimore, MD. 21201**
**(410) 468-3100**
**Rscarlett@ScarlettCroll.com**

**Attorneys for the Debtor**


**THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY**
**HELP YOU DECIDE WHETHER TO ACCEPT OR REJECT**
**THE DEBTOR'S PLAN OF REORGANIZATION.**
**PLEASE READ THIS DOCUMENT WITH CARE.**

## Table of Contents

| Description | Page |
|---|:---:|
| Disclosure Statement, Introduction to Case | 3 |
| Solicitation of Acceptances | 3 |
| Description and History of the Debtor | 4 |
| Requirements for the Disclosure Statement | 5 |
| The Circumstances that Gave Rise to the Filing of the Case | 6 |
| A Complete Description of the Available Assets and Their Value | 9 |
| The Anticipated Future Income of the Debtor | 9 |
| The Source of the Information Provided in the Disclosure Statement | 11 |
| The Condition and Performance of the Debtor While in Chapter 11 | 12 |
| Information Regarding Claims Against the Estate | 14 |
| A Liquidation Analysis Setting Forth the Estimated Return that Creditors Would Receive Under Chapter 7 | 18 |
| The Accounting and Valuation Methods Used to Produce the Financial Information in the Disclosure Statement | 19 |
| A Summary of the Plan of Reorganization | 19 |
| An Estimate of All Administrative Expenses, Including Attorneys' Fees and Accountant's Fees | 27 |
| The Collectability of any Accounts Receivable | 27 |
| Any Financial Information, Valuations or Pro Forma Projections that Would be Relevant to Creditors' Determination of Whether to Accept or Reject the Plan | 28 |
| Information Relevant to the Risks Being Taken by the Creditors and Interest Holders | 29 |
| The Actual or Projected Value that can be Obtained from Avoidable Transfers | 29 |
| The Existence, Likelihood and Possible Success of Non-Bankruptcy Litigation | 30 |
| The Tax Consequences of the Plan | 30 |

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)

*In re:*                                                    \*

**ANDREW B. HUDYMA,**                   \*          **Case No. 20-20661 NVA**

**Debtor.**                                         \*          **(Chapter 11)**

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## DISCLOSURE STATEMENT

## 1.  INTRODUCTION TO CASE

On December 8, 2020, Andrew B. Hudyma ("Debtor") filed a voluntary petition under Chapter 7 of the Bankruptcy Code whereby the Bankruptcy Court (the "Court") assumed jurisdiction. (Doc.1)  On January 19, 2021, upon request by the Debtor, this Court converted the Chapter 7 proceeding to a proceeding under Chapter 11 of the Bankruptcy Code.

As required by the Bankruptcy Code, the Debtor has filed with the Bankruptcy Court a Plan of Reorganization (the "Plan").

The Bankruptcy Code requires that the Debtor prepare and file a Disclosure Statement for the Court's approval and for submission to the Debtor's creditors.  The purpose of the Disclosure Statement is to disclose to the creditors and those parties-in-interest that information deemed by the Debtor to be material, important and necessary for his creditors to arrive at an informed judgment about the Plan filed by the Debtor with the Court.  A copy of the Plan accompanies this Disclosure Statement.

## 2.  SOLICITATION OF ACCEPTANCES

**THIS DISCLOSURE STATEMENT IS NOT TO BE CONSIDERED A SOLICITATION FOR ACCEPTANCES OR REJECTIONS OF THE PLAN, RATHER IT**

IS BEING FORWARDED TO YOU, AT THIS TIME, SO THAT YOU MAY CONSIDER IT IN THE LIGHT OF ITS INTENDED PURPOSE.  THIS PROPOSED DISCLOSURE STATEMENT MAY ONLY BE APPROVED BY THE COURT AFTER IT HAS BEEN DETERMINED THAT IT CONTAINS ADEQUATE INFORMATION.

NO REPRESENTATIONS CONCERNING THE DEBTOR (PARTICULARLY AS TO HIS BUSINESS OPERATIONS, VALUE OF PROPERTY, OR VALUE OF ANY NOTES, OR PAYMENTS TO BE ISSUED UNDER THE PLAN) ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS STATEMENT.  ANY REPRESENTATIONS, OTHER THAN AS CONTAINED IN THIS STATEMENT, SHOULD NOT BE RELIED UPON BY YOU IN YOUR CONSIDERATION OF THE PLAN.

THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT.  ALSO, BECAUSE OF THE COMPLEXITY OF THE DEBTOR'S FINANCIAL MATTERS, THE DEBTOR IS UNABLE TO WARRANT THAT THE BOOKS AND RECORDS, FROM WHICH SOME INFORMATION HEREIN IS DERIVED, ARE WITHOUT ANY INACCURACY.  THE DEBTOR HAS ATTEMPTED TO ASSEMBLE ACCURATE INFORMATION FOR THIS DISCLOSURE STATEMENT.

### 3.  DESCRIPTION AND HISTORY OF THE DEBTOR

The Debtor is involved in businesses which are a (1) successful tax preparation and tax negotiation business owned by the Debtor's wife, (2) a commercial and residential properties business and (3) a farming and poultry business with real property.  During the years that he has worked in these combined businesses, he and his wife has amassed approximately $14,089,679 of

primarily business real property assets with the unique attribute that currently almost all of the real property is worth more than the secured loans which the properties are collateralized by. *See* Exhibit 1. In addition, the Debtor values the personal assets owned by himself and his wife at approximately, $926,450. *See* Exhibit 1. The total personal and business assets are valued by the Debtor as being worth $15,016,129. These assets include property that the Debtor owns himself and jointly with his wife but does not include assets which are just owned by his wife.

The Debtor's and his wife's debts secured mostly by these assets are computed by the Debtor as $7,991,461.26. Therefore, for the assets set forth on Exhibit 1, the Debtor and his wife have a net equity value of about $7,750,430.

## 4.  REQUIREMENTS FOR THE DISCLOSURE STATEMENT

Over time, the Bankruptcy Court has established certain criteria for the Court to consider in evaluating whether a Disclosure Statement is sufficient. These criteria are summarized below, but are not exclusive of other matters that might be pertinent to the case from being disclosed to the Debtor's creditors. These criteria are discussed in this Disclosure Statement.

1. The circumstances that gave rise to the filing of the case;

2. A complete description of the available assets and their value;

3. The anticipated future income of the debtor;

4. The source of the information provided in the disclosure statement;

5. The condition and performance of the debtor while in chapter 11;

6. Information regarding claims against the estate;

7. A liquidation analysis setting forth the estimated return that creditors would receive under chapter 7;

8. The accounting and valuation methods used to produce the financial information in the disclosure statement;

9.     A summary of the plan of reorganization;

10.    An estimate of all administrative expenses, including attorneys' fees and accountant's fees;

11.    The collectability of any accounts receivable;

12.    Any financial information, valuations or pro forma projections that would be relevant to creditors' determination of whether to accept or reject the plan;

13.    Information relevant to the risks being taken by the creditors and interest holders;

14.    The actual or projected value that can be obtained from avoidable transfers;

15.    The existence, likelihood and possible success of non-bankruptcy litigation; and

16.    The tax consequences of the plan.

*See, e.g., Collier on Bankruptcy ¶ 1125.02[2].*

## 5.    <u>THE CIRCUMSTANCES THAT GAVE RISE TO THE FILING OF THE CASE.</u>

Even though the Debtor has consistently received a good income from his taxpayer an accounting work, the Debtor, as starting about two years before the filing of the bankruptcy, experienced a series of reductions in his cash flow which made it harder for the Debtor to services his secured debt.  In late 2018, the Debtor was dealing with Tysons Foods for his poultry operations on the Eastern shore.  Tysons Food wanted the Debtor to commit to about $350,000 of upgrades for his poultry operations in Maryland.  The Debtor indicated to Tysons that he was willing to perform the upgrades.  However, at this time, chicken sales were decreasing, and new farms were being established closer to Tysons Foods' processing operations.  The Debtor's property was the furthest away from Tysons Food operations and the Debtor believed that Tysons was trying to reduce the number of poultry farms it dealt with at that time.  The Debtor is aware that a lot of poultry farm operators, such as the Debtor, were let go from Tysons Foods poultry operations at

that time.  Therefore, there were many all reasons that the Debtor lost his Tyson Farms' poultry contract at that time, but the bottom line the Debtor believes he lost the business because of negative economic reasons that Tyson Farms was experiencing at that time.

The Debtor regrated but was alright with leaving Tysons Farms at that time because another large chicken producer, Allen Harim, or integrator, as the industry calls them,  indicated to the Debtor that the Debtor could move from Tysons Foods to that company's poultry operations.  In fact, Allen Harim did give the Debtor a temporary contract for such poultry operations.

Even though, the performance on the initial Allen Harim contract was slightly above average, at that time, the whole chicken market was decreasing in sales, so ultimately Allen Harmin did not renew the contract with the Debtor $175,000 of cash flow, making it harder to pay, on a monthly basis, all of the Debtor's secured creditors.

In addition to the above loss in cash flow and within about six (6) months, the Debtor also .experienced a tenant leaving his commercial property at 6 Ritchie Highway in Severna Park, Maryland, which is secured by M&T Bank.  This tenant loses, reduced the Debtor's case flow by about $144,000.00 per year.   The Debtor is currently waiting for information from his Landlord/Tenant lawyer so he can continue to try to collect from this tenant.  This potential legal suit will be discussed in more detail later in this Disclosure Statement.  The Debtor also was experiencing prior to the filing of the Bankruptcy Petition at 8213 Ritchie Highway a tenant that was no longer paying rent yet staying in the property, reducing the Debtor's cash flow.

Prior to the filing of the Debtor's Bankruptcy Petition, the Debtor responded to these cash flow problems by selling some properties to please his creditors such as Mid Atlantic Farm Credit, but such sales were not sufficient to be able to resolve this decreasing cash flow,  even though his accounting practice continued to be viable.

Within the year prior to the Debtor's filing of his Bankruptcy Petition, the stresses on the Debtor's cash flow emphasized some of the problems that the Debtor had with how he maintained his accounting system. Basically, the Debtor did not operate his accounting is normal manner. He used his different business operations and primarily the accounting firm's checkbook to constantly take draws and pay bills whenever and wherever they were needed. He did not deposit the monies into a personal checking account and then pay the bills. He also did not separate his businesses. This resulted in a general accounting problem which helped cause the bankruptcy filing and is now being addressed during the bankruptcy proceeding. For example, the Debtor has now hired an accountant and an accountant CPA firm who have and are continuing to assist the debtor in putting his bookkeeping and financial affairs in order.

One of the successes of this bankruptcy proceeding is the gradual movement of the Debtor to an accounting and record keeping system that more reflects the income and expenses of each of his businesses and also for his personal finances. To that effect, the Debtor has hired Hugh Blocker as his accountant, not just for giving advice in this bankruptcy proceeding, but also to restructure his financial accounting in a manner that will allow the Debtor to respond to his creditors' needs quicker in the future. Such progress is part of the bankruptcy process which is positive to debtors such as the Debtor.

Finally, another factor was that the Debtor experienced in his Delaware poultry operations a fire in his poultry houses. The Debtor is trying to receive compensation from his insurance company, but the insurance company is not paying at this time. The Debtor is retaining a Delaware attorney, subject to the approval of this Court, to negotiate an insurance settlement and hopes to receive some amount in excess of $150,000. However, at this time, the Debtor lists this claim at this time as unknown because of the complexity of the case.

The combination of the above factors led to a cash flow problem just before the filing of the Debtor's Bankruptcy Petition.  Just prior to the filing of the Petition, the Debtor was trying to negotiate to bring payments current with one of his primary secured creditors, Mid-Atlantic Farm Credit.  This creditor had begun for closing on some of the Debtor's properties.  The Debtor also commence trying to work out and catch up with payments to his creditor, BB&T now known as Truist Bank.  When these negotiations did not work out, and the next day Mid-Atlantic Farm credit was going to foreclose upon one of the Debtor's farm properties, the Debtor filed a petition for bankruptcy in order to avoid the foreclosure proceeding.

## 6.  A COMPLETE DESCRIPTION OF THE AVAILABLE ASSETS AND THEIR VALUE

To assist the Debtor's creditors in making an informed decision as to the Debtor's Plan of Reorganization, the Debtor has provided in Exhibit 1 a list of all of the Debtor's assets, broken down by business assets and personal assets.  The Debtor has provided his valuation or an appraiser's valuation of the different assets at both fair market value and liquidation value.  With respect to the potential litigation assets, the Debtor is currently valuing the litigation at one dollar each but gives a narrative of litigation later on in this Disclosure Statement.

## 7.  THE ANTICIPATED FUTURE INCOME OF THE DEBTOR

The Debtor's accounts have prepared a spreadsheet setting forth the Debtor's projected income in the future as Exhibit 6.  They conclude that the Debtor currently has sufficient income to be able to service the debt as set forth in the Debtor's Plan of Reorganization.  Therefore, the accounts believe that the proposed Plan is feasible.  To support this conclusion, the Debtor's accountants have reviewed the tax returns for the Debtor in previous years , and note that the accounting practice, by itself, produces enough money to be able to service the Plan and pay the

creditors.  They have prepared the Debtor's Income and Expenses as Exhibit 3.  An analysis of these of the Debtor's sales of Accurate Taxes of Maryland is attached hereto as Exhibit 5 and shows a constant historical income source for the Debtor.

In reaching the conclusion of the feasibility of the Debtor's proposed Plan,  the Debtor's accountants have reviewed both the bank statements of the Debtor's accounting firm, Accurate Taxes of Maryland LLC, and his previous year tax returns.  They have also talked to the Debtor to gain an understanding of his business operations.  Finally, they have also reviewed the Debtor's wife's bank statements in order to develop a joint income and expense analysis as set forth in Exhibits 2.

Hugh Blocker's comments is set forth in Exhibit 7 as to the feasibility of the Plan.

In concluding that the Debtor's Plan is feasible over the term of the Plan, the Debtor's accounts have made the following assumptions:

### Assumptions

1. The Debtor will continue to earn income from his accounting operations at the level that he is currently receiving.

2. The tax returns and the bank statements represent current, accurate statements of financial condition.

3. The projections in both income and expenses are in constant 2021 dollars, so both future income and expenses will grow at the same rate of inflation. However, for reporting purposes, constant dollars will provide more information to creditors than if there is adjustment for future years.

4. The accountants have primarily made their projections based upon current income and expenses of the Debtor; however, they assume, in the future, that the Debtor will be able to find another entity to contract with as an integrator for his poultry business and will be able to gradually increase number of leases those commercial properties listed on the schedules.

5. The accountants assume, based upon what they have been informed as the Absolute Priority Rule for distribution to creditors, pursuant to the Plan,

that the Debtor cannot, at this time, allocate monies to pay his unsecured taxing creditors until the secured creditors are paid in full.

### Conclusions by Accountants

Based upon the Accountant's analysis, Hugh Blocker, CPA concludes, to a reasonable degree of certainty for his profession, the following:

1. The Debtor's proposed Plan is feasible.

2. The Debtor should have sufficient cash flow to be able to meet his monthly obligations as set forth in the Plan.

3. The Debtor should continue to use accounting professionals to improve his accounting reporting so we can properly file future reports, both pre-confirmation monthly reports and post confirmation quarterly reports to this Court and tax returns to the federal and state taxing authorities.

4. The Debtor has improved his accounting during this bankruptcy proceeding to a point where I can provide these opinions, but the Debtor should continue to improve the accounting and separation of his business and personal affairs, to make it easier to make the appropriate financial Court accountings and tax accountings.

5. The Debtor, not paying his unsecured tax debt, frees up cash flow for the Debtor; however, his wife, who is not in bankruptcy, is possibly responsible for the tax debt.  Given her income, the Debtor's wife will probably be able to negotiate a deal with the IRS, and has the cash flow, to pay the IRS over six years or more at an approximate three percent (3%) interest rate.

### 8.  THE SOURCE OF THE INFORMATION PROVIDED IN THE DISCLOSURE STATEMENT

The source of the information provided in this Disclosure Statement comes from the following:

1. The Debtor and his information about his businesses and personal affairs, including his understanding of real estate valuations, accounting and bookkeeping practices, real estate, leasing and the poultry business.

2. The discussions, reports and conclusions developed by the Debtor's accountant, Hugh Blocker, C.P.A.

3.  The discussions, reports and conclusions developed by the Debtor's appraiser, Hugh Blocker, C.P.A.

4.  The discussions, reports and conclusions developed by the Debtor's appraiser, Trefer Appraisal Group and Thomas A. Weigand, MAI.

5.  The discussions, reports and conclusions developed by the Debtor's appraiser, Charles L. Ford, Inc. and Charles L. Ford, SRA, CREA.

6.  Discussions, reports and conclusions developed by the Debtor's attorneys at Scarlett & Croll, P.A.

7.  Discussions between the U.S. Trustee's Office and their agents with the Debtor's attorneys.

8.  Discussions by the Debtor's attorneys with the Debtor's creditors.

9.  A review by the Debtor's attorneys of reports from hired professionals, the pleadings filed in this bankruptcy proceeding, especially all of the objections filed by creditors and the U.S. Trustee's Office.

10. A review by the Debtor's attorneys of the comments made by this Court in the lift stay proceeding and the last Disclosure Statement hearing.

The Debtor has relied upon the following in developing his Plan of Reorganization:

a.  Appraisal made by Trefer Appraisal Group and Thomas A. Weigand, MAI.
b.  Appraisal made by Charles L. Ford, Inc. and Charles L. Ford, SRA, CREA.
c.  Reports provided by Hugh Blocker, CPA.
d.  Discussions and reports with the Debtor's bankruptcy attorneys, Scarlett & Croll, P.A.
e.  The Debtor's tax returns.
f.  Monthly reports.
g.  Bank statements for all the companies and business that the Debtor is involved in.
h.  The Debtor's wife's bank statements.
i.  Proofs of claims filed by the Debtor's creditors.
j.  Conversations with the Debtor's creditors with the Debtor's attorneys.
k.  Appraisal made by Trefer Appraisal Group and Thomas A. Weigand, MAI.
l.  Appraisal made by Charles L. Ford, Inc. and Charles L. Ford, SRA, CREA.
m.  Reports provided by Hugh Blocker, CPA.
n.  Discussions and reports with the Debtor's bankruptcy attorneys, Scarlett & Croll, P.A.
o.  Pleadings filed in this case, especially the Objections filed by the Debtor's creditors and the U.S. Trustee's office.

## 9.  THE CONDITION AND PERFORMANCE OF THE DEBTOR
## WHILE IN CHAPTER 11

The Debtor believes that he has made great progress while involved in this Bankruptcy Proceeding.  As set forth above, and more particularly described in the financial documentation provided by the Debtor's accountants, the Debtor is now in a position where he can financially propose a 100% payment plan to his creditors as set forth in the Plan of Reorganization.  This compares to the poor financial reporting condition that the Debtor found himself in at the beginning of this case.

Even though the Debtor prepares tax returns, the Debtor, himself, is not a Certified Public Accountant.  The Debtor has found a unique position in the taxpayer service offered by the Internal Revenue Service, or he can prepare tax returns for lower income individuals in a high quantity and receive from the Internal Revenue Service payment for his services from the taxpayer's refund.  This income, combined with his rental and forming income, was easily sufficient to cover the Debtor's monthly obligations prior to the filing of the Bankruptcy Petition.  The Debtor found himself in such a positive cash flow position before the filing of the Bankruptcy Petition, that he did not really have to care about monitoring his cash flow and controlling which accounts he withdrew monies from to pay bills, because there were always sufficient monies to be able to pay the bills on a timely basis.  So, when the Debtor filed his Bankruptcy Petition, he did not have, in place, sufficient systems and backup to be able to prepare monthly statements to show his personal and business income and expenses.

Since the filing of the Bankruptcy Petition, the Debtor has been able to organize his financial affairs in a manner that allows him to timely file his Monthly Reports.  As compared to other cases, this took a lot of work by his bankruptcy attorneys and accountants.  In addition, the

U.S. Trustee's Office reviewed the properties reported by the Debtor and discovered that there were insurance gaps on many of the properties. Working with the Debtor's two insurance companies, the Debtor has all the properties insured to a level that the Debtor believes is satisfactory to the U.S. Trustee's Office. The Debtor's attorneys, on a periodic basis, communicates with the U.S. Trustee's Office to keep that office informed about the progress of the Debtor's accounting, insurance, and efforts to present to this Court a feasible Plan of Reorganization. This has not been an easy bankruptcy to reorganize, but significant progress has been made since the filing of the Bankruptcy Petition.

Probably the greatest indicator of the Debtor's improvement during the time that the Debtor has been involved in his bankruptcy proceeding has been his regular payments of "adequate protection" during the bankruptcy proceeding. See Exhibit 5  The Debtor did not wait for this Court to order such payments, but, instead, began these payments almost immediately after the conversion of this case to a Chapter 11 bankruptcy proceeding. The monthly payments were based upon a calculation of 4.25%, or one over prime, amortized over 20 years for the different creditors, except for 1st Financial Bank, which was paid from the sales of chickens or flocks, and M&T Bank initially paid pursuant to a Court approved cash collateral order.

The restructuring of the Debtor's financial affairs and accounting, now allows the Debtor to submit a feasible Plan of Reorganization as described in this Disclosure Statement.

## 10.  INFORMATION REGARDING CLAIMS AGAINST THE ESTATE

The Debtor has been negotiating, but not soliciting, comments from almost all of his creditors. Set forth below is a summary of information about the creditor's claims without discussing specific settlement offers which the Debtor does not believe is appropriate to disclose

at this time, except to say that the Debtor is trying to negotiate a Plan that can be agreed upon by the creditors.

The Debtor's Plan of Reorganization is designed to comply with the provisions of the Bankruptcy Code to allow confirmation of the Plan by the Bankruptcy Court. The Plan is also designed to comply with the bankruptcy law dealing with the "Absolute Priority Rule" which prevents all senior priority creditors from being paid before a class of creditors can be paid. This is the reason that unsecured creditors cannot be paid before the Debtor's secured creditors are paid in full.

As set forth above, the Debtor's Plan of Reorganization provides for the division of the allowed claims and creditors and interest holders into thirteen (13) classes; a summary of these classes is set forth above and below:

Class I.        Class I claims consist of the claims for costs and expenses of Administration as defined in Section 503(b) of the Bankruptcy Code.

Class II.        Class II claims consist of Priority Claims allowed pursuant to Section 507 of the Bankruptcy Code, including, but not limited to, tax claims of governmental units, including the Internal Revenue Service and the Comptroller of the Treasury for the State of Maryland, but only to such extent that such claims are entitled to priority under Section 507(a)(6).

Class III.        Class III claims shall consist of the secured claim of MidAtlantic Farm Credit, ACA.

Class IV.        Class IV claims shall consist of the secured claim of 1st Financial Bank of Georgia.

Class V.        Class V claims shall consist of the secured claim of Truist Bank f/k/a BB&T.

Class VI.       Class VI claims shall consist of the secured claim of M&T Bank.

Class VII.      Class VII claims shall consist of the secured claim of George Teluk.

Class VIII.     Class VIII claims shall consist of the secured claim of Deer & Company.

Class IX.       Class IX claims shall consist of the secured claim of Kubota Credit Corporation.

Class X.        Class X claims shall consist of the secured claim of Wildcat, LLC.

Class XI        Class XI claims shall consist of the secured claim of Severn Savings Bank. LLC.

Class XII.      Class XII claims shall consist of the unsecured claim of the Internal Revenue Service.

Class XIII.     Class XIV creditors shall consist of all the allowed claims of unsecured creditors unsecured creditor.

Class XIV.      Class XIV claims shall consist of all the interests of the Debtor.

These claims are more particularly describe below.

| Class | Creditor | Description Owed |
|-------|----------|------------------|
| I | Administrative Creditors | These creditors are currently the Debtor's attorneys, accountants and appraisers. |
| II | Taxing Creditors | This creditor is Anne Arundel County for past due property taxes. |

| III | Mid-Atlantic Farm Credit | MidAtlantic Farm Credit, ACA ("MidAtlantic") is one of the largest agricultural lending banks on the East Coast. It is a bank dedicated to lending monies to farmers and poultry operations such as the Debtor's poultry operations. What is unique about this financial institution is that it was created with governmental assistance to make sure there was lending for farming operations giving more favorable terms to lending to farms and poultry operations. |
|-----|--------------------------|----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| IV | 1st Financial Bank of Georgia | 1st Financial Bank of Georgia ("1st Financial") is a Delaware banking institution that lends monies for poultry operations such as the Debtor's poultry operations located in Delaware. What is unique about 1st Financials' poultry loan is it does not get paid on a monthly basis but, instead, it is paid when the chickens sell on the property that the Debtor sells the chickens he raises that the bank maintains a security interest in. At the time the chickens sell, 1st Financial is paid what it is due. Thus, this payment arrangement is unique and has been a very favorable banking relationship with the Debtor. The Debtor proposes to keep this payment system under the same under the same terms and conditions set forth in the loan documentation with one exception. The exception is that at the time that the Debtor filed his Bankruptcy Petition, there were some monies owed to the creditor. |
| V | Truist Bank | Truist Bank, formerly known as BB&T, has lent to a building with an appraised value of $1,082,000. The building is security for Truist Bank's loan is generally a small building that can accommodate entities renting out the building for commercial activities. It is significant that the property fronts Richie Highway, a busy highway. At this time, the Debtor has no renters in the building but projects to be able to gradually fill the building with renters. The Debtor believes that the COVID epidemic had an effect on the building not being able to be rented before the bankruptcy proceeding. |

| VI | M&T Bank | M&T Bank has lent to the Debtor on a commercial building with two leases. Pursuant to the Cash Collateral Order the Debtor has been paying to this Bank the rentals from these leases. The building collateralizes M&T Bank's loan is generally a small building that can accommodate entities renting out the building for commercial activities. The Debtor believes that the COVID epidemic had an effect on the building not being able to be rented before the bankruptcy proceeding. |
| --- | --- | --- |
| VII | George Teluk | George Teluk is an individual and secured creditor who sold his rowhome to the Debtor (the "Property"). Even though the Bankruptcy Court did not lift the Automatic Stay pursuant to a Motion to Lift the Automatic filed by this creditor, the Bankruptcy Court did note at the lift stay hearing that this creditor was a small creditor compared to all of the commercial loans' worth around $7,860,708. The Court also noted that the creditor is over 80 years old and is dependent upon the monies generated for his retirement income from the Debtor's commitment to pay this creditor. Given the Court's comments, this creditor will receive the following from the Debtor. |
| VIII | John Deer & Company. | John Deer & Company is another small creditor of the Debtor which sold and financed a farm tractor to the Debtor. In computing how much to pay to satisfy the debt due on the tractor, the Debtor has accounted for the fact that the tractor has significantly depreciated in value. |
| VIX | Kubota Credit Corporation | Kubota Credit Corporation financed a farm tractor to the Debtor. In computing how much to pay to satisfy the debt due on the tractor, the Debtor has accounted for the fact that the tractor has significantly depreciated in value. |
| X | Wildcat, LLC | Wildcat, LLC is a small, secured creditor of the Debtor who is still owed a small amount of monies on a property which secures the debt. |
| XI | Severn Savings & Loan | The Class XI claim shall consist of the secured claim of Severn Savings Bank. Severn Savings Bank is a local Annapolis banking institution. Severn Savings Bank lent money on a commercial piece of property in Salisbury, Maryland in a manner that is an ordinary commercial loan. |
| XII | Internal Revenue Service | The Internal Revenue Service is an unsecured tax debt owed by the Debtor and his wife. Pursuant to the Bankruptcy Code's "Absolute Priority Rule", as more particularly described below, this creditor will be paid in full but after the priority creditors have been paid in full.<br><br>Since the Debtor projects that his wife equally owes the tax debt, the Debtor projects that his wife will try to enter into a separate |

| | | agreement with the Internal Revenue Service for payments over six years or more. Given that the Debtor's wife has sufficient income to make such payments, the Debtor projects that this debt will be significantly reduced by the time the Debtor will have to make payments on this unsecured debt. The Debtor's wife is not obligated to enter into such an agreement with the IRS, however, this information is provided in this Disclosure Statement to provide the Debtor's creditors information on this debt. |
|---|---|---|
| XIII | Unsecured Creditors | The Debtor's unsecured creditors, except for the Internal Revenue Service, did not represent a significant portion of the debt owed. |
| XIV | The Debtor | The Class XIV claims shall consist of all the interests of the Debtor. After the full payment to all of the Debtor's creditors, the Debtor's property will revest back to the Debtor. |

## 11. A LIQUIDATION ANALYSIS SETTING FORTH THE ESTIMATED RETURN THAT CREDITORS WOULD RECEIVE UNDER CHAPTER 7

Set forth in Exhibit 1 is a liquidation analysis of the Debtor's assets. The Debtor believes that proposed Debtor's Plan of Reorganization will provide the Debtor's creditors full payment in a more organized manner, fitting into the Debtor's cash flow abilities.

## 12. THE ACCOUNTING AND VALUATION METHODS USED TO PRODUCE THE FINANCIAL INFORMATION IN THE DISCLOSURE STATEMENT

The Debtor's accounting was performed on a cash basis and does not represent accrual accounting.

The valuations of the Debtor's properties were made by either the Debtor or his appraisers as set forth in Exhibit 1. The Debtor appraised two of his properties because those properties where the subject of two Lift Stay actions. The Debtor has obtained an estimate that to appraise the remaining properties, it would cost over $70,000 and would use up monies which the Debtor needs for his full payment Plan of Reorganization. Given this estimate, and the cash flow problems

such appraisals could cause, the Debtor has valued these properties himself. The Debtor has discussed this issue with his two farm credit lenders and with the U.S. Trustee's office.

## 13.  A SUMMARY OF THE PLAN OF REORGANIZATION

Preliminary Statement on Plan Payments – Absolute Priority Rule

The absolute priority rule is codified in 11 U.S.C.A. § 1129(b)(2)(B), which states:

> [W]ith respect to a class of unsecured claims- (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim, or (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section.  *See* Section 11 U.S.C.A. § 1129(b)(2)(B).

Under the absolute priority rule:

> [A] plan of reorganization may not allocate any property whatsoever to any junior class on account of the members; interest or claim in a debtor unless all senior classes consent, or unless such senior classes receive property equal in value to the full amount of their allowed claims, or the debtor's value, whatever is less.  *In re Sagewood Manor Associates Ltd. P'ship*, 223 B.R. 756, 772-773 (Bankr. D. Nev. 1998) (quoting 7 Collier on Bankruptcy P. 1129.04(4)(a)).

> "The absolute priority rule is one of the conditions of the fair and equitable standard necessary for cram down." *In re Draiman* 450 B.R. 777, 821 (Bankr. N.D. Ill. 2011).

With respect to the absolute priority rule full payment is recognized by Court to satisfy the requirement of this rule.  The Debtor's Plan is a full payment Plan within a reasonable time with reasonable interest rates as supported in the following cases:

> "In a feasible plan, periodic payments totaling the allowed amount of the claim, properly  discounted and from a reliable source, will adequately compensate a lienholder such as to satisfy cramdown." *In re Lakeside Global II, Ltd.,* 116 B.R.

499, 512 (Bankr. S.D. Tex. 1989) (quoting *In re Pikes Peak Water Co.*, 779 F.2d 1456, 1461 (10th Cir. 1985)).  "In all cases, the sum of the deferred cash payments, must equal the present value of the lienholders' claims in full." *Id.*

"Where a dissenting claimant is receiving payment in full over a reasonable period of time, with an appropriate interest or discount factor being paid, that creditor is receiving all the law requires, that is, - - - full payment over a reasonable period of time." *In re Pikes Peak Water Co.*, 779 F.2d at 1461 (quoting *In re Hollanger,* 15 B.R. 35, 46-47 (Bankr. W.D. La. 1981)).

<u>Preliminary Statement on Plan Payments – Reasonable Payment of Interest</u>

"If a judge thinks it necessary to modify the rate to avoid unjustified disparity, he can do so." *Till v. SCS Credit Corp*, 541 U.S. 465, 498, 124 S. Ct. 1951, 1972, 158 L. Ed. 2d 787 (2004).

<u>Adequate Protection Payments and Bank Loan Rates</u>

The Bankruptcy Court may adjust amortization rates, interest rates and maturity dates for loans to permit the Debtor to reorganize in a financially feasible manner.  In the past, this Court has accepted a 4.25% interest rate, which is one percent over prime rate, amortized over 20 years with a 20-year maturity date.  The Debtor considered such an extension to the secured loans; however, because of the nature of the loans and the fact that there is significant collateral involved in this Bankruptcy proceeding, the Debtor has adjusted the loans so that they will have a maturity date less than the 20 years that the Debtor's counsel has obtained from this Court in the past.  The adjusted and lowered maturity dates should reflect the nature of the following loans.  The Debtor is trying to present to this Court a feasible Plan of Reorganization with fair terms to all of the creditors given their special circumstances.

<u>The Plan Provides for the following Treatment of Creditors.</u>

The Plan provides that the aforesaid creditors shall be treated and paid as follows:

Class I.        Administrative Class I creditors shall be paid in full and in cash as and when their claims are allowed to be paid by Order of this Court or in accordance with such agreements or arrangements as may be made between the Debtor and holders of Class I claims.  Pursuant to Section 1123(a)(2) of the Bankruptcy Code, Class I creditors are not a class of claims which are impaired under the Plan within the meaning of Section 1124 and are deemed to accept the Plan under Section 1126(f).  **This class of creditors is not impaired under the Provisions of the Plan.**

Class II.        The Debtor's Class II priority creditors shall be paid their Priority Claims in full and in cash over a six (6) year term in quarterly installments, from the Debtor, after payment by the Debtor from the Escrow Account or from other assets of the Debtor of his Class I Administrative Creditors.  The Class II priority tax creditors shall receive, on account of their claims, deferred cash payments in twenty-four (24) quarterly installments, with the first quarterly installment due within thirty (30) days following the date of Confirmation of this Plan or the 1st day of the month, following fifteen (15) days after the Order of Confirmation of the Plan by the Bankruptcy Court is approved, whichever date shall occur to be later.  The holder of each such claim shall receive such deferred cash payments over a period of six (6) years in the amount equal to their Allowed Claim, plus simple interest at a rate of three percent  (3.00%) per annum, a rate discuss the single priority creditor.[1]  Pursuant to Section 1123(a)(2) of the Bankruptcy Code, Class II Priority Creditors are not a class of claims which are impaired under the Plan within the meaning of Section 1124 and are deemed to accept the Plan under Section 1126(f).  **This class of creditors is not impaired under the Provisions of the Plan.**

---

[1] The Anne Arundel real property tax Priority Creditor indicated in a telephone discussion that it might be willing to accept no rate of interest, but to accumulate 3% interest on the properties that owed real estate taxes and accept the interest when the properties were sold, but the debtor thought that some payment should be made to show good faith in this Plan.

<u>Class III</u>.      Class III claims shall consist of the secured claim of MidAtlantic Farm

Credit, ACA.  **This class of creditors is impaired under the Provisions of the Plan.**

Given the uniqueness of this financial institution, its loan would be modified as follows:

| **Description of Collateral** | **Value of Collateral** | **Amount Due** | **Payment Terms** |
|---|---|---|---|
| | | | |
| 37424 Millsboro Highway, Laurel, DE<br><br>8002 Green Lewis Road, Willards, MD<br><br>17421 Redhill Road, Accomack, VA<br><br>23420 Redhill Roads, Accomack County | $3,200,000 | $2,180,176.35 | Interest Rate – 5.00%<br>Amortization Time Period – 20 years<br>Monthly Payment – $14,388.20<br>Maturity Date – 10 years from Confirmation |
| | | | |

<u>Class IV</u>.      Class IV claims shall consist of the secured claim of 1st Financial Bank of

Georgia.  **This class of creditors is impaired under the Provisions of the Plan.**

The amount owed at that time will be treated as a pre-petition loan and will be paid as

follows:

| **Description of Collateral** | **Value of Collateral** | **Amount Due** | **Payment Terms** |
|---|---|---|---|
| | | | |
| 3137 Woodyard Road, Harrington, DE 19952 | $5,900,000 | $3,100,090 with amount due as of the date of the bankruptcy filing - unknown | Interest Rate – 4.25%<br>Amortization Time Period – 20 years<br>Monthly Payment – $Unknow at this time<br>Maturity Date – 15 years from Confirmation or payments will continue in the same manner, if no information is provided. |
| | | | |

Class V.    Class V claims shall consist of the secured claim of Truist Bank f/k/a BB&T. **This class of creditors is impaired under the Provisions of the Plan.**

This is more of a normal commercial business loan therefore the Debtor proposes the following modifications to the loan:

| Description of Collateral | Value of Collateral | Amount Due | Payment Terms |
|---|---|---|---|
| | | | |
| 8213 Ritchie Highway Severna Park, MD 21804 | $1,082,000 | $529,630.63 | Interest Rate – 5.00%<br>Amortization Time Period – 20 years<br>Monthly Payment – $3,495.32<br>Maturity Date – 5 years from Confirmation |
| | | | |

Class VI.    Class VI claims shall consist of the secured claim of M&T Bank. **This class of creditors is impaired under the Provisions of the Plan.**

This is more of a normal commercial business loan therefore the Debtor proposes the following modifications to the loan:

| Description of Collateral | Value of Collateral | Amount Due | Payment Terms |
|---|---|---|---|
| | | | |
| 6 Ritchie Highway Pasadena, Maryland | $2,500,000 | $1,360,861.54 | Interest Rate – 5.00%<br>Amortization Time Period – 20 years<br>Monthly Payment – $8,981.08<br>Maturity Date – 5 years from Confirmation |
| | | | |

Class VII.    Class VII claims shall consist of the secured claim of George Teluk. **This class of creditors is impaired under the Provisions of the Plan.**

| Description of Collateral | Value of Collateral | Amount Due | Payment Terms |
|---|---|---|---|
| | | | |
| 504 S. Washington, Baltimore, Maryland in a completed manner for $260,000 | $260,000 | $83,762.78 | Interest Rate – 4.25%<br>Amortization Time Period – 4 years<br>Monthly Payment - $1,900.25<br>Maturity Date – 2 years from Confirmation |
| | | | |

Class VIII.    Class VIII claims shall consist of the secured claim of Deer & Company.

**This class of creditors is impaired under the Provisions of the Plan.**

The Debtor shall treat this creditor as follows:

| Description of Collateral | Value of Collateral | Amount Due | Payment Terms |
|---|---|---|---|
| | | | |
| John Deer Tractor | $9,000.00 | $8,741.96 with amount due as of the date of the bankruptcy filing - unknown | Interest Rate – 4.25%<br>Amortization Time Period – 20 years<br>Monthly Payment – $54.00<br>Maturity Date – 5 years from Confirmation |
| | | | |

Class IX.    Class IX claims shall consist of the secured claim of Kubota Credit Corporation. **This class of creditors is impaired under the Provisions of the Plan.**

| Description of Collateral | Value of Collateral | Amount Due | Payment Terms |
|---|---|---|---|
| | | | |
| Kubota Tractor | $58,000.00 | $51,308.24 | Interest Rate – 4.25%<br>Amortization Time Period – 20 years<br>Monthly Payment – $317.72<br>Maturity Date – 5 years from Confirmation |
| | | | |

Class X.        Class X claims shall consist of the secured claim of Wildcat, LLC. **This**

**class of creditors is impaired under the Provisions of the Plan.**

| Description of Collateral | Value of Collateral | Amount Due | Payment Terms |
|---|---|---|---|
| | | | |
| 0 Wasena Ave. | $9,500.00 | $3,622 | Interest Rate – 4.25% Amortization Time Period – 5 years Monthly Payment – $22.43 Maturity Date – 3 years from Confirmation |
| | | | |

Class XI        Severn Savings & Loan.  This class will be paid as follows.

**This class of creditors is impaired under the Provisions of the Plan.**

| Description of Collateral | Value of Collateral | Amount Due | Payment Terms |
|---|---|---|---|
| | | | |
| 32057 Beaver Run Drive, Salisbury. MD | $500,000 | $88,518.33 | Interest Rate – 5.00% Amortization Time Period – 20 years Monthly Payment – $584.18 Maturity Date – 5 years from Confirmation |
| | | | |

Class XII.        Class XII claims shall consist of the unsecured claim of the Internal

Revenue Service. **This class of creditors is impaired under the Provisions of the Plan.**

| Description of Collateral | Value of Collateral | Amount Due | Payment Terms |
|---|---|---|---|
| | | | |
| | $0 | $418,473.86 | Interest Rate – 3% being the interest discuss with the IRS as being acceptable Amortization Time Period – 20 years Monthly Payment – $2,591.33 Maturity Date – 6 years from Confirmation |

|  |  |  |  |
|---|---|---|---|
|  |  |  |  |

Class XIII.    Class XIII creditors shall consist of all the allowed claims of unsecured creditors other than the Internal Revenue Service.  These creditors shall receive on monthly basis full payment of their claims over a period of one (1) year after all other creditors have been paid in full. **This class of creditors is impaired under the Provisions of the Plan.**

Class XIV.    Class XIV claims shall consist of all the interests of the Debtor.  After the full payment to all of the Debtor's creditors, the Debtor's property will revest back to the Debtor. **This class of creditors is impaired under the Provisions of the Plan but cannot vote for the Plan.**

### 14.    AN ESTIMATE OF ALL ADMINISTRATIVE EXPENSES, INCLUDING ATTORNEYS' FEES AND ACCOUNTANT'S FEES

The Debtor has currently spent about $100,000 with the Debtor's attorneys with $35,000 available in the Debtor's escrow account to pay the attorneys . The Debtor projects that this case will cost about $50,000 more to confirmation.  The Debtor is paying $5,000 per month toward those fees which are deposited in the escrow account until approval by the Court.

The Debtor is preparing his first fee petition for the Court and has already paid, for the most part, his appraisal fees.  Therefore, the primary fees that will be due at the Court and time of the confirmation will be the attorney's fees and the accountant's fees.

The Debtor has currently spent about $3,000 with the Debtor's attorneys with $3,000 available in the Debtor's escrow account to pay the attorneys . The Debtor projects that this case will cost about $26,000 more to confirmation.  The Debtor is paying $3,000 per month toward those fees which are deposited in the escrow account until approval by the Court.

As to the appraisal fees, the Debtor is not aware of any appraisal bills currently pending in that they have already been paid.

### 15.   THE COLLECTABILITY OF ANY ACCOUNTS RECEIVABLE

The only account receivables that the Debtor has litigation cases that he is currently valuing as worth $1/each.

Litigation No. 1 – This case involves a fire in the Delaware poultry houses secured by First Financial of Georgia.  Even though the Debtor currently values the claim at $0 it could produce approximately $150,000 within the next year if not earlier in funds.

Litigation No. 2. – The second litigation involves a collection in the tenant that owes money to the Debtor for unpaid rent.  The Debtor is still trying to get information from his previous attorney to be able to support a legal suit to be filed against this tenant.  The issue here is the potential collectability, but the case could produce, within the year, approximately $50,000.

Litigation No. 3. - This is litigation against the Debtor's creditor, Mid-Atlantic Farm Credit to remove, has a preference, a judgment that they filed in Anne Arundel County within 90 days prior to the filing of the Debtor's bankruptcy proceeding.  In addition, the Debtor is considering amending the suit to add a $50,000 claim for monies that were paid out of the ordinary course of business within 90 days prior to the filing of the Debtor's bankruptcy proceeding

### 16.   ANY FINANCIAL INFORMATION, VALUATIONS OR PRO FORMA PROJECTIONS THAT WOULD BE RELEVANT TO CREDITORS' DETERMINATION OF WHETHER TO ACCEPT OR REJECT THE PLAN

Most of the creditors, being the Debtor's secured creditors, are sophisticated entities that should be able to utilize the information contained in this Disclosure Statement, combined with their own knowledge of the property, to make an informed decision whether or not to accept or

reject the Plan.  The basic information that has not been included is the impact of COVID and the potential future leases and contracts with chicken suppliers.  With the end of COVID, the Debtor is aggressively trying to obtain leases and has entered into discussions with a chicken "integrator" to begin operating some of his chicken business which are currently dormant.

The Debtor also believes that he had a better than average year in his accounting practice so he should have sufficient funds to be able to fund the Plan of Reorganization that he proposes to this Court.

The main consideration for not having all of the Debtor's properties appraised was because of the additional $70,000 of costs for such appraisals.  This was done after a discussion with the Debtor's two (2) poultry creditors and to the U.S. Trustee's office.  This decision was for a business reason and has been disclosed by this Disclosure Statement to the Debtor's creditors and should be considered in accepting or rejecting the Debtor's Plan of Reorganization.

### 17.    INFORMATION RELEVANT TO THE RISKS BEING TAKEN BY THE CREDITORS AND INTEREST HOLDERS

Since the Debtors primary assets are real estate assets, the question to the Debtor's secured creditors is whether or not they want a payout, with the interest rate and maturity date proposed by the Debtor or do they want to take the chance of liquidating the properties at foreclosure.  The Debtor believes that the Plan that he proposes is a fair plan on extending the time period of December 16.

### 18.    THE ACTUAL OR PROJECTED VALUE THAT CAN BE OBTAINED FROM AVOIDABLE TRANSFERS

The Debtor has filed suit to avoid the judgement that MidAtlantic Farm Credit has transferred within 90 days prior to the filing of the Bankruptcy Proceeding to Anne Arundel County.  The Debtor is currently reviewing whether or not he can do the same thing with respect

to another judgment obtained by Truist Bank but has not filed suit as of yet. Finally, the Debtor has paid $50,000 to MidAtlantic Farm Credit as a good-will gesture for a potential meeting before the bankruptcy was filed and within 90 days of the bankruptcy filing.  The Debtor is reviewing whether the suit that he filed against MidAtlantic Farm Credit should be amended to include this amount.  Therefore, with respect to MidAtlantic Farm Credit, the Debtor might be able to to avoid a judgment lien in Anne Arundel County, be able to receive approximately $50,000.  This potential claim that is currently listed as valued at  $1 since really the Debtor is not sure what is the collectability given potential defenses to the monies that were transferred.  As to the lien avoidable transfers, no monies should be projected to the Debtor's creditors from such actions other than the $50,000.00.

### 19.      THE EXISTENCE, LIKELIHOOD AND POSSIBLE SUCCESS OF NON-BANKRUPTCY LITIGATION

Besides the current negotiations going on with respect to the insurance claim, and those potential avoidable transfers, the Debtor does not project any non-bankruptcy litigation.

### 20.      THE TAX CONSEQUENCES OF THE PLAN.

Since the Debtor has been showing losses, primarily due to the depreciation and the fact that some of his farm properties and commercial properties are not generating sufficient monies to be able to pay the secured creditors, the Debtor believes that his current taxes will be minimal if not nothing given the potential credits that could be applied to his tax returns.  As to the taxes he owes to Anne Arundel County, they are being treated as a priority creditor in the Plan and will primarily be paid at the time the properties are sold or refinanced.  As to the amount of unsecured debt that the Debtor owes to the Internal Revenue Service, the Debtor is currently talking to the Internal Revenue Service about the fact that it cannot receive monies from the Debtor until after all priority creditors and secured creditors have been paid in full.  As stated above, with respect to

this unsecured creditor, the Debtor projects but cannot count on, his wife entering into an agreement for more than six (6) years using her income to be able to pay this creditor since his wife equally owes the money at this time.


## 21.  AN ANALYSIS OF THE OBJECTIONS FILED TO THE INITIAL DISCLOSURE STATEMENT

In the last Disclosure Statement hearing, creditor Mid-Atlantic Farm Credit, indicated that there was some need to discuss flock to flock contracts and what they are.  A flock-to-flock contract is when the integrator that is contracted by Andrew Hudyma agrees to provide the necessary land, housing and poultry operation to be able to develop a flock.  What the integrator does is contracts with the Debtor, then provides young chicken or "broilers" to grow in the Debtor's poultry houses.  The industry has developed in a manner that it is not the Debtor that provides most of labor.  The the integrator that provides and manages the growth of a particular flock of broilers.  In other words, the integrator sends someone around on a regular basis to make sure that the Debtor is growing these chickens for sale in the proper manner.

So finally, after the chickens have grown, and they are sold to the integrator.  At that time, the secured creditor gets its payments.  This operation continues on from "flock- to-flock".

### Manager for Mid-Atlantic Poultry Operations

Since there are no operations at the Mid Atlantic poultry properties, they are being overseen and managed by Jeffrey Stapleford.  If the Debtor is successful in his current negotiations with a new integrator, the Debtor expects to hire more people along with the staffing that the integrator will provide in order to be able to service the flocks.  If deeded by the integrator, the Debtor will hire a another manager when he receives a new contract.

## Updating Mid-Atlantic Poultry Operations

The Debtor believes that his poultry operations that are secured by the Mid- Atlantic Loan are in good shape and do not need substantial upgrading.  However, the Debtor does expect, if he receives a contract from an integrator for the Mid-Atlantic properties, that he will have to expend some monies modifying the poultry operations to meet the requirements of the new integrator. This is not projected to be of substantial cost, but the Debtor cannot tell, at this time, how much that will be without finishing the negotiations with the potential integrator.

## Texaco Town Road

This property was security for Mid Atlantic which was sold about 1 ½ years ago.

Dated:  August 30, 2021

/s/ Andrew B. Hudyma
Andrew B. Hudyma

Submitted by:

/s/ Robert B. Scarlett
Robert B. Scarlett
Federal Bar No. 01424

SCARLETT & CROLL, P.A.
201 N. Charles Street, Suite 600
Baltimore, Maryland 21201
RScarlett@ScarlettCroll.com
(410) 468-3100
(410) 332-4026 (fax)

*Attorneys for the Debtor*

**Certificate of Service**

I HEREBY CERTIFY that on this 30th day of August, 2021, I caused a copy of the above

to be sent via electronic mail per CM/ECF guidelines to:

**Electronic Mail Notice List** - Parties in the case only

- **Herbert Burgunder**    hb3@pklaw.com
- **Richard L. Costella**    rcostella@tydings.com, jmurphy@tydings.com
- **Andrew Martin Croll**    amcroll@scarlettcroll.com,
  krynarzewski@scarlettcroll.com;crollar64434@notify.bestcase.com
- **Richard A. DuBose**    rdubo@gebsmith.com
- **Jessica Hepburn-Sadler**    sadlerjh@ballardspahr.com,
  andersonn@ballardspahr.com
- **Katherine A. (UST) Levin**    Katherine.A.Levin@usdoj.gov,
  amy.busch@usdoj.gov
- **Keith M. Lusby**    klusby@gebsmith.com
- **John D. Sadler**    sadlerj@ballardspahr.com,
  andersonn@ballardspahr.com;LitDocket_East@ballardspahr.com
- **Robert B. Scarlett**    RScarlett@ScarlettCroll.com,
  krynarzewski@scarlettcroll.com;mmyers@scarlettcroll.com;scarlettrr64434@notify.bestcase.com
- **US Trustee - Baltimore**    USTPRegion04.BA.ECF@USDOJ.GOV
- **Jonathan M. Wall**    jwall@hwlaw.com,
  mshipley@hwlaw.com;cgay@hwlaw.com;lhendricks@hwlaw.com

**Manual Notice List**

The following is the list of **parties** who are **not** on the list to receive e-mail
notice/service for this case (who therefore require manual noticing/service). You may
wish to use your mouse to select and copy this list into your word processing program
in order to create notices or labels for these recipients.

**Hugh D. Blocker**
Hugh D. Blocker, CPA
Suite 23
2411 Crofton Lane
Crofton, MD 21114

**Deere & Company, d/b/a John Deere Financial**
c/o Scott Fink

Agent for Creditor
965 Keynote Circle
Brooklyn Heights, OH 44131

**Charles L Ford**
Charles L. Ford, Inc.
347 Prestonfield Lane
Severna Park, MD 21146

**Synchrony Bank**
c/o PRA Receivables Management, LLC
PO Box 41021
Norfolk, VA 23541

**Thomas A. Weigand**
Treffer Appraisal Group
1244 Ritchie Highway Ste. 19
Arnold, MD 21012

and those creditors on the attached matrix.

/s/ Robert B. Scarlett
Robert B. Scarlett
Federal Bar No. 01424

State of Maryland DLLR
Division of Unemployment Insurance
1100 N. Eutaw Street, Room 401
Baltimore, MD  21201-2225

U.S. Attorney – District of MD
36 S. Charles Street, 4th Floor
Baltimore, MD  21201-3020

Wildcat, LLC
c/o KMA Law Office
540 Ritchie Hwy, Ste. 201
Severna Park, MD  21146-2927

Yvette Hudmay
8157 Solomons Crossing Court
Millersville, MD  21108-1207

Andrew B. Hudyma
8157 Solomons Crossing Court
Millersville, MD  21108-1207

George Teluk
605 South Patterson Park
Baltimore, MD  21231-3215

Deere and Company
c/o Scott Fink, Agent for Creditor
965 Keynote Circle
Brooklyn Heights, OH  44131-1829

Synchrony Bank
c/o PRA Receivables Management, LLC
P.O. Box. 41021
Norfolk, VA  23541-1021

1st Financial Bank of Georgia
4239 Mundy Road
Oakwood, GA  30566

Truist Bank
7220 Wisconsin Avenue, 4th Floor
Glen Burnie, MD  21060

American Express, NA
c/o Becket and Lee LLP
P.O. Box. 3001
Malvern, PA  19355-0701

Comcast
P.O. Box 1931
Burlingame, CA  94011-1931

Deere & Company
c/o Weltman, Weinberg & Reis Co., LPA
P.O. Box 93784
Cleveland, OH  44101-5784

George Teluk
Herbert Burgunder III, Esq, Rimon P.C.
1501 Sulgrave Avenue, Ste. 311
Baltimore, MD  21209-3654

Keith Lusby, Esquire
Gebhart & Smith
1 South Street, Ste. 2200
Baltimore, MD  21202-3281

MidAtlantic Farm Credit, ACA
c/o Richard L. Costella
Tydings & Rosenberg, LLP
One East Pratt Street, Ste. 901
Baltimore, MD  21202-1249

Truist Bank
Ballard Spahr LLP
c/o John D. Sadler
1909 K Street NW, 12th Floor
Washington, DC  20006-1152

8002 Green Lewis Road
Willards, MD  21874-1292

Anne Arundel County, Maryland
Office of Law
2660 Riva Road, 4th Floor
Annapolis, MD  21401-7055

Capital One, N.A.
4515 N. Santa Fe Avenue
Oklahoma City, Ok 73118-7901

Department of Treasury
Internal Revenue Service
P.O. Box 7346
Philadelphia, PA  19101-7346

Internal Revenue Service
Centralized Insolvency Operations
P.O. Box 7346
Philadelphia, PA  19101-7346

Kubota Credit Corporation
100 Kobota Drive
Grapevine, TX  76051

Severn Bank
Hyatt & Weber, P.A.
c/o Jonathan Wall, Esquire
200 Westgate Circle, Ste. 500
Annapolis, MD  21401-3374

US Trustee – Baltimore 11
Garmatz Federal Courthouse
101 West Lombard Street, Ste. 2625
Baltimore, MD 21201-2668

Alexis E. Kramer, Esquire
Ewing, Dietz, Fountain & Kaludis
16 South Washington Street
Easton, MD  21601-3008

US Securities and Exchange
Atlanta Reg. Office
950 E. Paces Ferry Rd, NE, Ste. 900
Atlanta, GA  30326-1382

Comptroller of Maryland
Bankruptcy Unit
301 W. Preston Street, Rm. 312
Baltimore, MD 21201-2396

George Teluk
624 South Patterson Avenue
Baltimore, MD  21224

John and Jessica Sadler
Ballard Spahr LLC
1909 K Spahr, LLC, 12th Floor
Washington, DC  20006

Kubota Credit Corporation
P.O. Box 9013
Addison, TX  75001-9013

M&T Bank
1 M&T Plaza, 8th Floor
Buffalo, NY  14203

MidAtlantic Farm Credit, ACA
45 Aileron Court
Westminster, MD  21157-3022

M&T Bank
Legal Document Processing
626 Commerce Drive
Amherst, NY  14228-2307

Secretary of the Treasury
15 & Pennsylvania Avenue
Washington, DC  20220-0001

MidAtlantic Farm Credit
1614 E. Churchville Road, Ste. 102
Bel Air, MD  21015-2052

Severn Savings Bank

200 West Gate Circle

Annapolis, MD  21401-3373

Hugh D. Blocker
Hugh D. Blocker, CPA
2411 Crofton Lane, Ste. 23
Crofton, MD  21114

Charles L. Ford
Charles L. Ford, Inc.
347 Prestonfield Lane
Severna Park, MD  21146

Thomas A. Weigand
Treffer Appraisal Group
1244 Ritchie Highway, Ste. 19
Arnold, MD  21012